THOMAS H. BRADY *vs.* ORLANDO W. NORCROSS.

Hampden.    September 27, 1899. — October 20, 1899.

Present: HOLMES, C. J., KNOWLTON, LATHROP, HAMMOND, & LORING, JJ.

*Personal Injuries — Master and Servant — Defective Appliance — Due Care —*
*Negligence — Law and Fact — Instructions — Evidence.*

In this case, which was an action for personal injuries occasioned to the plaintiff, while in the defendant's employ as a painter, by the fall of a staging upon which he was sitting, caused by the giving way of a bracket where it was nailed to an upright, the questions whether the plaintiff was in the exercise of due care, whether there was any negligence in the care of the staging, whether that negligence, if any, was attributable to either of two persons in authority, one of whom ordered the plaintiff to go upon the staging, and whether either of them was a person whose chief duty was that of superintendence, and to whom as a part of that duty the care of this staging was intrusted by the defendant, were questions for the jury; nor could it be said that, if the weight of the plaintiff and two fellow workmen who sat near him caused the bracket to break, the plaintiff could not recover, but that was for the jury to consider in connection with the other evidence.

At the trial of an action for personal injuries occasioned to the plaintiff, while in the defendant's employ, by the fall of a staging upon which he was sitting while at work, the defendant has no ground of exception to an instruction to the jury that " if there was any defect in the staging, and that defect caused the injury, and was not known to " A., who ordered the plaintiff to go upon 'the staging, or B., who had charge of the staging, " and could not have been discovered by the exercise of ordinary care and prudence, there can be no recovery; but if that defect was known to them, or if, by the exercise of reasonable care and prudence on their part, they would have discovered it, and they were superintendents, then the plaintiff can recover."

In an action for personal injuries occasioned to the plaintiff, while in the defendant's employ as a painter, by the fall of a staging upon which he was sitting, caused by the giving way of a bracket where it was nailed to an upright, which formerly rested upon the floor, but which had been cut so as to leave the bottom several feet from the floor, a conversation on the day before the accident between A., who gave orders to the painters and who ordered the plaintiff to go upon the staging, and B., who had charge of the staging, relating to its condition, is admissible in evidence to show that each had had notice of such condition; and it is within the discretion of the judge to allow A. to testify that in his judgment the cutting of the upright would have a tendency to weaken the stage, and also as to the persons from whom he received orders.

TORT, for personal injuries.    The declaration contained counts under the employers' liability act, St. 1887, c. 270, alleging negligence of the defendant's superintendent, and also a count at common law.    After the former decision, reported 172 Mass.

331, the case was tried in the Superior Court, before *Maynard,* J., who allowed a bill of exceptions, in substance as follows.

The plaintiff was employed by the defendant as a painter during the construction of a building in Worcester, and was injured by the fall of a staging in a large counting-room.

The plaintiff testified to the following facts: He went to work on the morning of the accident at seven o'clock. He first went down into the paint shop and got paint. Afterwards he came up on the third floor, from which place he went on to the gallery round the counting-room in the building. This counting-room was on the second floor, and was about one hundred feet long by nearly fifty feet wide, and about thirty-five or forty feet high. He was accustomed to go upon the staging from the gallery below, which was eighteen or twenty feet from the floor, and was made of stucco. It was a rail gallery, which did not extend entirely around the room. The staging itself was an ordinary one, made out of uprights, ledger boards, and braces of all kinds. The uprights were held together by ledger boards. The planks used to walk on rested on the ledger boards and brackets, the latter being made of spruce, and nailed to the uprights. The braces composing these brackets were from three quarters of an inch to an inch and a half in thickness. The staging went all around the room. There were two different tiers of brackets.

He had worked for the first time upon the staging during the week before he received his injury, priming and giving the walls the first coat. He went upon the staging on the day of the accident by order of one Douglass, who did not do anything but give orders. He was accustomed to receive orders from Douglass. The plaintiff had nothing to do with the staging itself, or the erection of it. When Douglass gave the order to go to work, the plaintiff was standing on the gallery. There were four or five other men on the gallery at the time. After receiving the order, the plaintiff got over the railing on to the plank where he was going to work. From the top bracket it was about eighteen or twenty feet to the floor. There was no one else on the plank with the plaintiff. Knight and Remilly were on the next plank. The planks were from ten to fourteen or sixteen feet long, and were eight or ten inches wide and two inches thick. The plank that the plaintiff was on was an ordinary twelve or

fourteen foot plank, and extended over and rested on the brackets. The other plank was above that plank. He went right where Douglass told him to go, near the gallery, on the right hand side of the upright, and about two feet from it. He began work by dusting the stucco work, and had been in this position about two minutes, when he found himself on the floor.

On cross-examination, the plaintiff testified that Knight and Remilly were not far away from him, and that all were within four or five feet of one another.

Frank Douglass, called as a witness by the plaintiff, testified that he worked in March, 1897, for the defendant in the building in question; that he had no particular work, sometimes he directed, and sometimes he worked; that he painted walls or anything else that wanted painting; that when he was not painting walls he was looking after the help, and giving them directions what to do; that sometimes he helped to build stagings; that he directed the plaintiff to go to work upon the staging in question; that the accident happened on Monday; that on the previous Saturday he had another man with him, and went up there to brace the top of the staging; that he had examined the staging and found that it was weak and swayed back and forth; that about six weeks before the painters went to work to put on this coat of paint, he had been upon this staging with the same purpose in view, and found the staging firm; that between these times a floor had been laid under the staging; that in laying the floor the uprights of the staging planks had to be moved to get the plank under it, there had been lots of braces and ledgers taken out of the staging, and an upright had been cut off the staging; that there was a staging built in the main staircase, and the stagings were braced from one to the other; that the staging over the main staircase had been taken down before the day of the accident; that one Smith was present, directing the work of the staging; that he directed the carpenters and laid out the work for them; that the witness went upon the top of the staging when he made the examination, and found that the staging was weak and that it swayed; that he then went to one Stevens, who looked after the painters, and told him the condition of the staging, and he told him to go to Smith; and that the witness went to Smith and had some talk with him on

the Saturday before the accident.   The witness was then asked:
" What was the conversation with Smith?"

Subject to the defendant's exception, the witness answered as
follows: " I went to Mr. Smith and asked him to fix the stag-
ing.   He wanted to know the matter with the staging.   I told
him it was weak.   I told him it was not fit to go on.   He wanted
to know why not.   I said, ' If you go on top, it will sway back
and forth.'   He said it was just the same as before.   I said, ' No,
you have since laid the floor.'   He said, ' Yes.   And taken off
the staging from the main staircase, which was braced from one
to the other.'   He said, ' Yes.'   I said, ' The staging ought to
be fixed up; I calculate to go on Monday with fifteen or twenty
men.'   He said it was just like it was before, and it was all
right.   Said it was just as good as it ever was.   I said it was
not.   I don't remember whether I spoke about the upright, but
I told him he took the braces from one stage to the other, and
laid the floor, which weakened the staging.   But he insisted on
the staging being all right to work on."

The examination of the witness was continued as follows:
" *Q.* Now, when you first went to work on the staging to clear
up this matter, what part of the staging had been laid?
*A.* What we call the top floor. — *Q.* It was the laying of that
floor that necessitated the raising of these uprights? *A.* Yes,
sir. — *Q.* Did Mr. Smith do anything in response to your re-
quest with reference to this staging? *A.* No, sir. — *Q.* Now,
what did you do, if anything? *A.* I reported back to Mr. Ste-
vens that Mr. Smith said the staging was all right. — *Q.* What
did you do? *A.* I went to brace the stage from the top.   I
took another man with me. — *Q.* What did you do when you
say you braced the stage? *A.* I nailed a piece upon the up-
right against the iron casing. — *Q.* What upright? *A.* The
upright of the stage. — *Q.* How many pieces did you nail. *A.*
Well, I should judge half a dozen, perhaps more. — *Q.* Did you
do anything at all with reference to this upright that had been
cut off? *A.* No, sir. — *Q.* Whereabouts was that upright cut?
*A.* It was, I should judge, six or eight feet from the floor.
— *Q.* Whether or not there was anything underneath this up-
right, where it had been cut? *A.* No, sir. — *Q.* Whether or
not you saw that on the Saturday before the day of the acci-

dent?  *A.*  I do not remember whether I spoke to Mr. Smith about this upright being cut or not. — *Q.* How long before Saturday, to your best recollection, was it that you saw the upright had been cut? *A.* It might have been a week, or it might have been two.  I noticed it was cut when I went through the room. — *Q.* Whether or not Mr. Smith was round there, after the upright had been cut? *A.* Yes." The witness was then asked : " What effect would the cutting of that upright have on the stage at that point? "

Subject to the defendant's exception, the witness answered : " I should judge it would have the effect of weakening the staging." The witness also testified that he saw the upright after the accident; that it was just the same as it was before, there was nothing under it where it had been cut off; that the bracket which was nailed to the upright where the plank ran was broken off; that he could not say how the bracket broke, but it broke both lengthwise and crosswise; and that Stevens did manual work, but he could not say how much.

Subject to the defendant's exception, the witness was asked the following question : " Whether or not there was anybody else in the building that you looked to for orders?" To which he answered "No."

On cross-examination, the witness testified that on the Saturday in question it took him between two and three hours to fix up the staging; that he got material to fix the staging out in the yard; that after he had braced it, it was fairly well braced, and did not sway from the top; and that there was not enough swaying of the staging to prevent the men from working comfortably upon it.

William Pike, called as a witness by the plaintiff, testified that he was working for the defendant on the day of the accident; that he received his orders from Douglass and Stevens; that Douglass directed the men what to do, and showed them what was to be done; that once in a while he did a little himself, but did not spend one third of the time, on an average, in doing manual work; that he went round and looked the stagings over and fixed them up, and fixed planks and got them ready for the men to work on; that Stevens gave directions to Douglass, and also the rest of the painters; that he did very

little manual work; that Smith gave orders and did not do any manual work; that the witness had first worked upon this staging two or three weeks prior to the accident; that on the day of the accident the witness went to work at seven o'clock, and got on the staging from the gallery at the third floor; that Douglass told the plaintiff to go to work on the staging; that the plaintiff went on the east side, and Knight and Remilly were on the same side; that the upright was cut off four or five feet from the floor; that the brackets that were broken were on the upright that was cut off; that the brackets were splintered lengthwise, and crosswise, too, next to the upright, and that a piece of the splinter was hanging on the nails next to it, as if it had ripped out.

Edward Knight, called as a witness by the plaintiff, testified that he was on the staging when it fell, about four feet from the plaintiff, on a different plank; that he received his order to go upon the staging from Douglass; that at the time of the accident, the witness was dusting off the wood, getting ready to paint; that after the accident, he saw that two brackets were broken on the upright that was cut off; that when he got down there, the lower bracket was on the floor, and the upper bracket was hanging to the upright; that the lower bracket was broken lengthwise, close to the nail; that Stevens took charge of the painters, gave directions to Douglass, and gave directions to the men to do the work; that Stevens saw that the colors were mixed properly, and the witness did not think he did any manual labor; and that Smith gave orders to the carpenters, and did not do any manual labor.

On cross-examination, the witness testified that he had seen Douglass, Smith, and Stevens working with their hands.

At the conclusion of the plaintiff's evidence, the defendant requested the judge to rule as follows:

" 1. There is no evidence to warrant a verdict for the plaintiff on any count in the declaration, and the verdict must be for the defendant.  2. The plaintiff cannot recover on the first count of his declaration.  3. If the jury find that the weight of the plaintiff and his fellow workmen, Knight and Remilly, caused the brackets to break, then the plaintiff cannot recover.  4. There is no evidence of any negligence on the part of either Smith or Douglass, for which the defendant is responsible.  5. If there

was a defect in the staging, and that defect was the sole cause of the accident, then the plaintiff cannot recover."

The judge refused to give the rulings requested; and the defendant excepted. The plaintiff waived all the counts of his declaration, with the exception of the first count, and the case was allowed to go to the jury on that count, under the employers' liability act.

The judge instructed the jury, in part, as follows:

"If these two men were too heavy; and if you find it was negligent on their part to get together, if it was their negligence which caused the staging to break, the plaintiff cannot recover, because he must be in the exercise of due care. If it was not negligent for him to go on to that staging with the other men, then was it negligent on the part of Douglass to send them there, and that depends upon what Douglass knew or ought to have known. . . .

"There is one more thing I have been asked to suggest to you, and that is, that if there was any defect in the staging, and that was the sole cause of the accident, the plaintiff cannot recover. If there was any defect in the staging, and that defect caused the injury, and was not known to Douglass or Smith, and could not have been discovered by the exercise of ordinary care and prudence, there can be no recovery; but if that defect was known to them, or if, by the exercise of reasonable care and prudence on their part, they would have discovered it, and they were superintendents, then the plaintiff can recover. If, under these circumstances, they directed the workmen to go upon the stage, and the workmen did not know about it, then it would be negligence of the superintendents; otherwise, it would not."

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*H. Parker & C. C. Milton*, for the defendant.

*J. B. Carroll & W. H. McClintock*, for the plaintiff.

HAMMOND, J. When this case was before us upon exceptions taken by the defendant at a former trial, in which the plaintiff obtained a verdict upon the count at common law, it was said that, even if the breaking of the bracket was of itself evidence of negligence in the construction of the staging on the part of some one, it was not evidence from which it could fairly be inferred that the negligence was that of the employers. And the

following language was used by Barker, J. : " The evidence did not tend to show that they [the employers] furnished the staging as a structure, nor that they assumed to exercise any control or supervision as to how it should be built or kept or adapted for the work, nor that they failed to furnish a sufficient quantity of suitable materials, nor that they employed improper workmen." And the exceptions were sustained. *Brady* v. *Norcross,* 172 Mass. 331, 336. The case is now before us upon exceptions taken by the defendant at the second trial, in which the plaintiff obtained a verdict upon the first count in the declaration, which is based upon the employers' liability act. St. 1887, c. 270.

Without reciting the evidence in detail, it is sufficient to say that the questions whether the plaintiff was in the exercise of due care, whether there was negligence in the care of the staging, whether that negligence, if any, was attributable either to Douglass or to Smith, and whether either or both of them was a person whose chief duty was that of superintendence, and to whom as a part of that duty the care of this staging was intrusted by the defendant, seem to us to be upon the evidence questions of fact for the jury, and not of law for the court.

As the case went to the jury only on the first count, the first and second requests were substantially the same. They were properly refused, as was also the fourth.

Nor could it be said that, if the weight of the plaintiff and his fellow workmen, Knight and Remilly, caused the bracket to break, the plaintiff could not recover. All that was for the jury to consider in connection with the other evidence.

The instructions of the court as to the matter of the fifth request were sufficiently favorable to the defendant.

We see no error in the manner in which the court dealt with the defendant's requests.

The conversation between Douglass and Smith tended to show that each had notice of the condition of the stage, and it was admissible to show such notice.

It was within the discretion of the court to allow Douglass to testify that in his judgment the cutting of the upright would have a tendency to weaken the stage, and also as to the persons from whom he received orders.

*Exceptions overruled.*