Decided 16 March; rehearing denied 3 August, 1903.

## ROBINSON *v.* TAKU FISHING COMPANY.

[71 Pac. 790.]

DAMAGES FOR INJURY TO SERVANT—CONSTRUCTION OF COMPLAINT.

1. A complaint alleging that plaintiff was injured by the falling of a pile, which was caused "by the gross negligence of the defendant in failing to provide safe and proper appliances for the raising and setting of the same, and in providing an unsafe and dangerous appliance for raising and setting said piles by rope with block and tackle attached to the front of said cannery, with weak and insufficient guy ropes to keep said piles from falling to either side as they were raised, and in not attaching said rope with block and tackle to the front of said cannery higher than twenty-five feet from the ground," must be construed to charge negligence only in using improper guy ropes and in attaching the tackle too low on the building, the general terms being itemized, so to speak, to these two particulars.

PROXIMATE CAUSE OF INJURY.

2. Plaintiff and his fellow-employes were engaged in raising piles with a block and tackle. Guy ropes were provided with which to steady the pile as it was being raised. A pile was prepared to be hoisted, and the guy ropes had been made fast to it, when the men attempted to lift it, but, being extra heavy, after the men had lifted it a short distance, they being unable to lift it further, it swung round, breaking the guy rope, and fell on plaintiff. *Held,* that the proximate cause of the injury was the inability of the men to hold up the pile, and not the breaking of the guy rope.

From Multnomah: ALFRED F. SEARS, JR., Judge.

This is an action by Albert Robinson against the Taku Fishing Co. to recover damages for injury resulting from defendant's alleged negligence. The complaint sets out that plaintiff, while in the discharge of the duties of his employment at defendant's cannery, was assisting in raising and setting in place certain heavy piles by means of a rope with block and tackle, attached to a window of the cannery about twenty-five feet from the ground, and half-inch guy ropes to hold the piles from swaying to either side when being raised to a perpendicular position; that while plaintiff was so engaged, and without any negligence on his part, one of the guy ropes broke, causing the pile then being lifted to sway suddenly to one side, and fall upon him, thus inflicting the injury of which he complains; that the falling of said pile, as alleged, was

caused "by the gross negligence of the defendant in failing to provide safe and proper appliances for the raising and setting of the same, and in providing an unsafe and dangerous appliance for raising and setting said piles by rope, with block and tackle, attached to the front of said cannery with weak and insufficient guy ropes to keep said piles from falling to either side as they were raised to a perpendicular position, and in not attaching said rope, with block and tackle, to the front of said cannery higher than twenty-five feet from the ground." The general facts, as shown by the testimony, are substantially as follows: The defendant, the Taku Fishing Company, during the spring of 1901, was engaged in conducting a fish cannery at Snettisham, Alaska. The plaintiff, a tinner by occupation, was employed by the company to work about the cannery as a common laborer, and to perform such services as he should be directed. One James Skipenger was in charge of the cannery, and acted in the capacity of superintendent and manager. At the time of the accident the superintendent was engaged in raising and setting in place some piles, intended as a support or underpinning for a wharf which was being constructed between the two wings of the cannery. These wings were some twenty-five or thirty feet apart, and the piles, consisting of round timbers about twenty feet in length and twenty inches in diameter, were being set in a line midway between them; the first being ten or twelve feet from the main building, and the others a like distance from each other. Nine or ten men were assisting at the time, and, to facilitate the work, a rope, with block and tackle, was made fast to a timber placed across a window in the main building, some twenty-five feet above the ground, the rope being attached to the pile to be put in place, which was raised or hoisted to a perpendicular position by the men pulling on the rope. For the purpose of staying or holding the pile in trim as it was being hoisted, guy ropes were attached to it, one extending on either side, and at first made fast to the piling under the wings of the cannery. Some of the workmen were required to lift the top of the pile as high as they could, where-

upon others, with their assistance, when relieved from the lift, would hoist it into position by means of the rope and tackle, the guy ropes being loosened as occasion demanded.   Plaintiff commenced work for the defendant on the 28th of March, and on the 4th of April, the day of the accident, while engaged in building a smokestack, he was directed by the superintendent to assist in setting the piles in place.   Two had then been set. He assisted with the third, and while engaged in raising the fourth was injured.   The men at the pile had raised it as high as they could, when for some reason it swung to the right, and the guy rope attached on the left parted near its fastening to the pile, which fell to the ground, and upon plaintiff's leg, breaking the lower bones thereof, and crushing his ankle.   At the time no one had hold of either of the guy ropes.   The men were directed to help lift the pile, and the time had not yet come for loosening the guy ropes from their fastenings beneath the wings of the cannery and regulating their tension as needed for holding the pile in trim.   When plaintiff rested his case, the court, upon defendant's motion, granted a judgment of nonsuit, from which this appeal is prosecuted.

AFFIRMED.

For appellant there was a brief over the names of *Fulton Bros., George C. Stout,* and *John T. McKee,* with an oral argument by *Mr. McKee.*

For respondent there was a brief over the name of *Pipes & Tifft,* with an oral argument by *Mr. Martin L. Pipes.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

1. There is a controversy relative to the scope of the complaint, counsel for plaintiff insisting that it specifies two grounds of negligence on the part of the defendant—one in furnishing a weak, defective, and insufficient guy rope; and the other in devising and providing a hoisting apparatus dangerous in principle, and unsuited to the purpose to which it was applied.   The gravamen of the complaint is contained in the averment that the injury was caused by the defendant's gross

negligence, which consisted in providing an unsafe and dangerous appliance for raising and setting said piles by a rope with block and tackle attached to the front of said cannery, with weak and insufficient guy ropes to keep said piles from falling to either side as they were being raised to a perpendicular position, and in not attaching said rope with block and tackle to the front of said building higher than twenty-five feet from the ground. This allegation is preceded, it is true, by one in effect that the negligence consisted in failing to provide safe and proper appliances for raising and setting the piles, specifying in no way or particular of what the failure to provide such safe and proper appliances consisted; and must be considered to have been merged in the affirmative and more specific allegation as to providing an insufficient and dangerous appliance. The latter allegation is the affirmative way adopted by the pleader of stating the same fact that by the former is stated negatively. The nature of the negligence charged being thereby specifically and particularly stated, it may well be supposed that reliance is placed upon the more specific allegation for recovery; so that the clear analysis of the complaint limits the negligence to providing weak and insufficient guy ropes and in not attaching the block and tackle at a greater height on the cannery building. Whether or not, therefore, defendant was negligent in not providing any other appliance or apparatus for raising the piles, such as a derrick, or the like, is a question that does not seem to be in the case, and plaintiff must be confined to proofs of the unsafe and improper construction, and the use of weak and unsafe instrumentalities in the particular appliance adopted and devised for the purpose: *Boyd* v. *Portland Elec. Co.* 41 Or. 336 (68 Pac. 810). This simplifies very much the work of resolving the problem in hand.

The master's duties are determined, not with reference to the grade or rank, or the authority to employ or discharge the workmen, or to direct their employment, but by the nature and character of the act to be done or duty to be discharged. If the act or duty is such as pertains to or devolves upon the master, and it is negligently done or omitted, and injury ensues to

the employe, the master is liable; otherwise, if the act or duty
is one devolving upon the employe.   Among the duties of the
master are those of exercising reasonable care and precaution
for the safety of those in his service by providing them with
tools and appliances reasonably fit, safe, and suitable for their
work, and a reasonably safe place in which to do their work,
and by observing reasonable diligence and prudence in shield-
ing them from unusual dangers and perils.   Such duties as
these cannot be delegated so as to shield or excuse the master,
and whoever performs them does so in the master's stead, he
remaining liable for injury arising from negligence attending
their performance: *Mast* v. *Kern*, 34 Or. 247 (54 Pac. 950,
5 Am. Neg. Rep. 88, 226, 75 Am. St. Rep. 580, and note); *Bru-
nell* v. *Southern Pac. Co.* 34 Or. 256 (56 Pac. 129, 5 Am. Neg.
Rep. 711); *Wagner* v. *Portland,* 40 Or. 389 (60 Pac. 985, 67
Pac. 300); *Johnson* v. *Portland Stone Co.* 40 Or. 436 (67 Pac.
1013, 68 Pac. 425); *Telander* v. *Sunlin* (C. C.), 44 Fed. 564.
These principles are conceded, and another, invoked by plain-
tiff, that has been judicially promulgated, may as well be, so
far as it has relevancy to the present controversy, which is
that, when the selection of materials or the adaptation or con-
struction of appliances to suit them to the work in hand is such
as is within the scope of the employment, and may be properly
left to the workmen in their capacity as such, and is so left to
them by the master, he is relieved from responsibility for their
negligence, and whether a particular case falls within the duty
of the master or that of the employe becomes a mixed question
of law and fact, to be submitted to the jury as to the fact under
legal rules, its determination depending upon the facts of the
case: *Donnelly* v. *Booth Bros. Granite Co.* 90 Me. 110 (37 Atl.
874); *Arkerson* v. *Dennison,* 117 Mass. 407; *Robinson* v. *Blake
Mfg. Co.* 143 Mass. 528 (10 N. E. 314); *Brady* v. *Norcross,* 174
Mass. 442 (54 N. E. 874); *Great Northern Ry. Co.* v. *McLaugh-
lin,* 17 C. C. A. 330 (70 Fed. 669).

2. But we are of the opinion that none of them can avail the
plaintiff as against the contention of counsel for defendant
made at the argument, namely, that the breaking of the guy

rope, the weakness and insufficiency of which is complained of, was not shown by proofs sufficient to go to the jury to be the proximate cause of the accident. There is absolutely no evidence in the record pertinent to establish the allegation of the complaint that the rope, with block and tackle, was not attached to the cannery building at the proper height above the ground. This feature seems to have been entirely lost sight of at the trial. But as to the insistence that the guy rope was weak and unsafe, its relevancy depends upon the use sought to be made of it in hoisting the pile into position, and this will require further reference to the testimony. The guy rope, so called, was not such in the sense of its use in connection with a derrick. It is there used as a stay to hold the central mast or spar in position at the top, and not in connection with the substance or weight to be lifted. In the present instance its purpose was to serve as a guide to the weight as it was being hoisted into position. Thus the function each is to perform is very different in principle. There were but two witnesses to the accident called at the trial—the plaintiff and one A. W. Northern. The former testified as follows: "When we lifted the pile about six or seven feet from the ground, it was too heavy for us, and we could not lift it, and it swung over," and on cross-examination, as interrogated: "Q. Do you know how that pile came to swing around? A. The guy rope broke and swung down. * * Q. You did not see it break? A. The pile would not swing around without the guy rope broke. The boys said it broke. I didn't see it after I got hurt. Q. I will ask you whether you know that the guy rope broke except by what occurred afterward. A. I just know the pile fell down. Q. I will ask you whether you saw it break, or saw it after it was broken. A. I didn't see it after it was broken. Q. You did not see it break at the time it broke? A. Only the pile fell down. * * Q. How were the guy ropes fastened? A. Fastened to the cannery and piles. Q. How high, about? A. Three feet and a half. Q. Tied around the piles? A. Yes. * * Q. How high had that pile got up when it swung around? A. Overhead. Q. Had it got out of reach?

A. No; we had it in our hands, and could not lift it any further.   Q. And then it swung around?   A. Yes. * *  Q. How far did it swing?   A. As far as it could.   Q. Which way did it run?   A. To the right.   Q. You run the same way the pile fell?   A. I suppose I could not get out any other way.   Q. If you were facing the pile, it swung around that way?   A. Yes. We all run that way, because we could not get out any other way.   We could not tell which way it would fall.   Q. You just knew it got away from you?   A. Yes.   Q. And you made a jump?   A. I don't remember.   It knocked me down. * * Q. Were those guy ropes that you speak of—were they tight— were they pretty tight when you were lifting that pile? A. Some of the men were told to tighten the guy rope.   Q. And they did tighten it?   A. Yes.   Q. Did any men have hold of this guy rope?   A. Not when we were lifting the pile.   Q. How were those guy ropes slackened?   A. I told you the boys changed the guy rope, were told to tighten them, and come and help us lift the pile.   Q. Who slackened the guy rope as the pile went up?   A. Nobody.   Nobody was hold of the guy ropes when the pile fell down.   Q. Explain how the pile could be lifted by the men pulling on the rope when the guy ropes are tight.   A. I did not say they were tight.   Q. If they were slack, what could they do to keep the pile from swinging around?   A. That is the reason I got hurt.   Q. Because they were slack?   A. Because nobody changed them.   Q. There was nobody there at the end of them to slacken them up? A. No, sir.   Q. And you got hurt because they were slack? A. Because they were slack.   Q. Is that your idea?   A. Because the pile swung over, and the guy rope broke, is the reason I got hurt.   Q. Explain how the guy rope would be of any service at all in keeping that pile straight in line, unless it was either held by some person so as to hold the pile in position, or the rope was tight.   A. I beg your pardon.   I was a greenhorn, and did not know anything about it.   That was my first work.''

Northern testified, as examined: ''Q. How was this pile kept from working from side to side?   A. By a guy rope on

each side. * * Q. What was the cause of the breaking of that
rope? A. I presume there was too much strain on it. Q. Ex-
plain to the jury how that strain occurred, and what ought to
have been done in order to prevent the strain. A. The heavy
weight of the spile, I suppose. That was the only way it could
have broken. Q. It was fastened to the spile? A. Yes, fast-
ened to the spile. * * Q. The two ends of the guy rope, one
was fastened to the pile and the other was fastened in the
wing of the cannery? A. Yes. Q. Was there anybody that
had hold to slack it? A. No; not at the time of the breaking.
Q. Or at any time while these piles were being lifted? A. Yes,
after we got the strain on the tackle—strain enough to lift it
up—then there had to be a man on each side to attend to the
guy rope, to let it go up. Q. And then the man would un-
fasten that? A. Let it slack. Q. It was not tight? A. This
was tight at the same time. Q. Was that the right way to do
that? A. They were told to tighten that up, and come and
help lift the spile. It was an extra heavy one. Q. And in-
stead of making it loose they tightened it up? A. Yes. Q. Do
you know they were tied up tight? A. They were not tied up
any tighter than they ought to be. They were tight enough to
hold the spile in position in the right place. Q. Explain how,
without the slack in the rope, you could lift that pile? A. We
were under it, and we lifted it as far as the men could lift.
They gave the spile all the space there was until the guy rope
got tight. Q. Could they raise it any higher until the guy
rope was slackened? A. No; not when the guy rope got tight;
then it could not raise any more until it was slackened.
Q. Didn't there have to be a man there to attend to the rope?
A. Most certainly, there would have to be a man there. We
had to get the strain on the cable so as to get the lifting power.
Q. When you went to pull on it, then there ought to have been
a man there to take that guy rope loose from where it was?
A. Yes, after it started. Q. But it fell before that was done?
A. Yes. Q. And it fell, you think, because the rope had too
much strain on? A. Couldn't be anywhere else in a place like
that. Q. If there had been a man there at the end of that guy

rope, and he had loosened it at the proper time, then the rope would not have broken, would it?  A. He couldn't loosen it. He had to loose it after we got the strain on the cable to get it high enough.  Q. How high up would you raise that pile before it would be necessary to loosen that guy rope?  A. High enough to get the weight straight on the cable.  A cable would not pull that way (illustrating).  It has to be on an angle of at least 45 degrees before it would have strength enough to pull it up.  Q. It would have to be raised as high as your head?  A. Yes.  Q. If a man had been there, and slackened that guy rope when you got it up as high as you did get it up, there would not have been strength sufficient to break the rope?  A. We did not have the guy rope all past the natural slack yet.  Q. Then do you think the time had not come when that slack ought to have been made?  A. No; that time had not come yet on the pile.  Q. Then the pile went around faster than you expected it to?  A. Yes, it did.''

It is very apparent from this testimony that the time had not yet come for the guy ropes to serve their purpose.  The weight of the pile had become too great for the men.  As plaintiff said, ''We had it in our hands, and could not lift it any further,'' and then, as a consequence, it swung around and fell.  It would manifestly have fallen, whether the rope parted or not; but the rope was made absolutely fast in the first instance, it being intended to leave slack enough to permit of the pile being raised as high as the men were able to lift it, or, as stated by Northern, so as to get the strain on the rope with block and tackle, at which time the guy ropes were to be loosened, and used to hold the pile in trim, and to guide it to its place as it went up.  Three piles had been hoisted into position by the same instrumentalities without trouble or accident, but the one in question, being extra heavy, the men could not lift it further, and it swung around, not because the rope parted, but because they permitted it to do so, either having become alarmed or exhausted, thereby losing control of it; and this at a time when it was not intended that the guy ropes should be of service to them, and when, from the nature of the

42 OR.—35

device, they could not have been.   There is, therefore, lacking
in this case a sufficient or proximate cause attributable to the
breaking of the guy rope to permit the case to go to the jury
as to the negligence of the defendant in the particular respect
complained of.   These considerations affirm the judgment of
the trial court, and it is so ordered.                AFFIRMED